**David J. RAY, Plaintiff,**

v.

**METROPOLITAN LIFE INSURANCE COMPANY, Defendant.**

Civ. A. No. H–93–132.

United States District Court, S.D. Texas, Houston Division.

Feb. 11, 1994.

Charles M. Kinsey, Pearland, TX, for plaintiff.

Jeffrey Lloyd Joyce, Brian F. Antweil, Winstead Sechrest & Minick, P.C., Houston, TX, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

HUGHES, District Judge.

1. *Introduction.*

David Ray's Energy Resources Management claims that its contract with Metropolitan Life Insurance Company was extended for an additional two years because Met Life's notice of its election not to continue was ineffective. Because Met Life substantially complied with the notice requirement and because Met Life fully complied with an independent provision that allowed termination on a thirty-day notice, Ray will take nothing from Met Life.

2. *Background.*

David Ray had a proprietorship called Energy Resources Management. It became Water Technology of Texas. Transwestern Property Company was a real estate management firm. It became an operation of Metropolitan Life Insurance Company. Energy Resources agreed with Transwestern for Energy Resources to monitor and analyze water use on the properties that Transwestern manages for owners in downtown Houston. By demonstrating that the buildings' water use did not equate to the use of city sewerage, Energy Resources could earn substantial rebates for its clients of sewer fees charged by the City of Houston. Evaporation through the cooling systems was the principal non-sewer loss of consumed water.

The contract had a three-year primary term. The term would extend for two additional years unless one party notified the other of its election not to continue. This notice had to be given between thirty and ninety days before the expiration of the initial three years.

As the three years neared an end, both parties to the contract had changed. Transwestern had become Met Life, and Energy Resources had become Water Technology of Texas. In the normal course of contract performance, Energy Resources had changed its address three times; it used addresses on Featherwood, Hansen Road, and Gulf Freeway.

On April 24, 1991, fifty days before the contract's expiration date, Met Life wrote Energy Resources at its Gulf Freeway address. Energy Resources says it never received that letter. On May 15, 1991, twenty-nine days before the contract would have expired and one day past the deadline for notice, Energy Resources sent Met Life a letter thanking it for renewing the contract. Met Life responded immediately. In a letter Energy Resources received at the Gulf Freeway address on May 17, Met Life explained

that it had sent its notice of termination on April 24th, enclosing a copy of that earlier letter.

Gulf Freeway was the address where Met Life had been sending checks and other correspondence to Energy Resources; however, this was not the address of notice in the contract nor had Energy Resources written Met Life to change their address for notice purposes. Energy Resources replied that the notice was not received on time and that it was not sent to the address specified in the contract, which was on Featherwood.

On June 14, 1991, Met Life sent Energy Resources written notice of termination under an independent clause that allowed midterm cancellation on thirty days' notice. Energy Resources furnished services until July 14, 1991, and Met Life has paid for all of those services. Energy Resources has sued for what it would have been paid had the contract been in effect for the entire extension period.

### 3. *Initial Notice: Sent & Received.*

█ Energy Resources denies that it received the April 24th letter, and it questions whether it was sent. The court finds that it was. The evidence showed that it was prepared and processed as were all of the other letters sent to Energy Resources. The likelihood that the letter was not received is remote, especially since all the other correspondence was received.

### 4. *Full Compliance: Modification by Practice.*

█ The contract required that notice of the election not to renew had to be sent to the addresses specified in the contract. That meant the Featherwood address for Energy Resources, although there is a typographical error in the address. Nevertheless, the address requirement was modified by practice.

By July 1991, Energy Resources had had four different addresses during the time of the contract. In April of 1991, Water Technology of Texas sent its invoices with a return address on the Gulf Freeway. Indeed, the thank-you letter to Met Life was sent on stationery with that address. Nothing be-

tween the parties indicated a problem in the use of the company's current address for all of the business correspondence, including checks that were all promptly negotiated. Energy Resources had never objected to Met Life's use of its addresses nor indicated an address-of-preference to Met Life, except in the original document; when the contract was signed, the address specified in it was Energy Resources's only address. Here, both sides of the contract had gone through permutations of ownership, name, and address, and yet, despite those changes, only the April 24th letter was mislaid.

There may have been a reasonably knowable, substantial reason to have notices sent to a different address than the checks. For example, the account could have been assigned to a bank for collection, and if the checks were being sent to Energy Resources in care of Chase Manhattan, Met Life should have known not to send a notice of this type to the bank. Alternatively, Energy Resources's financial office could have been in one place and its executive office in another. Yet there is nothing in the relation between these parties that suggested or would suggest to Met Life that Energy Resources's principal office and executive operations were not carried out at the addresses it used in all of its daily business. The court finds that there was a modification of the precise address requirement through practice.

### 5. *Substantial Compliance: Wrong Address.*

█ Even if there was no modification of the contract, receipt of the notice at the wrong address was substantial performance. An address that is correct in all respects, except that it is not the address in the notice section of the contract, can fully perform the function of the specified address, absent the special circumstance that a particular, separate address for distinct purposes is brought to the attention of the contracting party. *See Texas Utilities Electric Company v. Aetna Casualty & Surety Company,* 786 S.W.2d 792 (Tex.App.—Dallas 1990, writ denied) (Using the wrong address in the city was adequate when the contract only specified the city.); *Southern Region v. Chattanooga*

*Warehouse,* 612 S.W.2d 162 (Tenn.Ct.App. 1980) (Renewal notice sent to the Atlanta office instead of the Washington office.)

### 6. *Substantial Compliance: Late Notice.*

■ If the original letter did not arrive at Energy Resources, receipt of the May 16th letter on May 17th at the Gulf Freeway address substantially complied with the contract. The notice was sent to an address where it effectively communicated the information about the termination. This notice was indisputably three days late.

■ An option, the essence of this provision, must be carefully construed; care, however, does not require a mindless absolutism. Even when the contract requires written notice by registered mail, sending unregistered written notice is effective if received. *Barbier v. Barry,* 345 S.W.2d 557, 562 (Tex.Civ. App.—Dallas 1961, no writ). Time is critical in many options, but time was of little consequence in this arrangement. Energy Resources expended nothing in reliance on the apparent extension. It forewent no opportunity. It imparted no new technical information to Met Life or for its benefit between May 14th and May 17th, the lapse in the notice. The May 16th letter complies substantially with the notice requirements, and, under these circumstances, performed completely the function for which the contract requirement was intended, and it performed the function without damage to Energy Resources.

### 7. *Full Compliance: Thirty Day Out.*

■ In an independent provision, the contract allowed either party to terminate the contract at any time on a thirty-day written notice. Under this provision, Energy Resources would continue to be paid one-half of the savings resulting from its efforts until the contract's regular termination by expiration. The contract could be read that, under the 30–day clause, the continued payment for savings applies to the two-year extension.

On the face of the contract, if the thirty-day clause had been exercised by Met Life in the first three years, payments for work already done would continue for the balance of the three-year term. Water Technology of Texas was allowed to recoup its initial costs and to profit from its disclosure of the means of achieving the utility savings by full payment through the three years. Energy Resources argues that the two-year extension is added to the primary term, making Met Life liable to it for one-half the savings on buildings monitored in the primary term. Because the "early" termination was exercised during the two-year extension, Energy Resources urges that it is entitled to a continuation of the benefits of the primary term. While that interpretation is plausible, it is more likely that the paragraph means that, if additional work is done during the two year extension, the continuation of benefits clause applies to that work, but not to work done in the original three years.

When drafting the contract, the parties contemplated that Energy Resources would make an investment in time and work and would be obliged to disclose its proprietary information. Much of the investment would be early in the contract, and much of the benefit necessarily had to be spread over the contract period. Three years was agreed as a reasonable period for Energy Resources to recover its investment and profit. Energy Resources expended no additional effort during the thirty days that elapsed under the extension period. Since the continuation of benefits clause applies only to work done in that thirty days, Energy Resources did not earn anything beyond payment for the actual work performed. Met Life's thirty-day notice and payment of the account through July 14th (the last day of operation) complied with the express terms of the contract.

### 8. *Attorney's Fees.*

A reasonable attorneys' fee for the necessary services for Energy Resources to prosecute the case through trial is $6,750.

### 9. *Conclusion.*

Because, at a minimum, Met Life substantially complied with it obligation to notify Energy Resources that it did not choose to continue the contract, Energy Resources will take nothing, and, by implication, the judg-

ment will declare that the contract with Met Life ended July 14th, 1991, at the latest.